THE STATE OF FLORIDA EX REL. THE ATTORNEY-
GENERAL, PLAINTIFF, VS. JAMES E. JOHNSON,.
DEFENDANT.

1. The Governor has power, under section 15 of the executive article of the Constitution, when acting within the authority there conferred, to hear and decide as to the existence of any alleged neglect of duty in office as a ground for suspending an officer. This authority, whether judicial or administrative in. its nature, is vested by the Constitution in the Governor as a member of the executive department, and does not appertain. to, and cannot be exercised by the courts.

2. The Governor may, under section 15 of the executive article of the Constitution, suspend an officer for neglect of duty in office, without giving previous notice to the officer of the charge made against him; but it is the Governor's duty to notify any officer he may suspend of the cause of such suspension, and give him a hearing on such charges, and re-instate him if the evidence does not sustain the charges. The officer has a constitutional right to such hearing.

3. So long as the Governor's action in suspending an officer is within the limits of his constitutional power, the courts can not interfere to arrest his action. He is the exclusive judge, in so far as the courts are concerned, of the sufficiency of the proof of the charge, not merely because the courts have been given no power of review, but for the further reason that the Senate, a branch of the legislative department, has been granted such power.

4. Under §154, R. S. Fla., electors had the right to pay poll taxes on Saturday, September third, 1892, to qualify them to vote at the election of October 4th of the same year; but whether or not a tax collector was guilty of neglect of duty in not receiving the taxes on the former day, is, so long as the Governor acts.

28

within the limits of his constitutional powers, a question for the Governor's decision, viewed as a ground for the suspension of the collector from office.

5.  Where an officer has been regularly suspended by the Governor under section 15 of the executive article of the Constitution, for any cause recognized by that section, and the successor of the suspended officer has been regularly commissioned, the latter officer is entitled to the official property of the office, and *mandamus* is the proper remedy to compel the suspended officer to deliver it; and the new appointee is not a necessary party to the proceedings, but the Attorney-General is a proper and sufficient relator.

This is a case of original jurisdiction.

. The following, omitting the certificates of the Secretary of State to exhibits A and B, are the pleadings upon the motion to quash the alternative writ herein :

*The State of Florida to James E. Johnson, Greeting :*

Whereas, It has been suggested by the petition of the Attorney-General of the State of Florida that heretofore, to-wit: On the 29th day of October, A. D. 1892, his Excellency, Francis P. Fleming, Governor of Florida, suspended from the office of tax collector of Duval county, until the adjournment of the next session of the Senate, you, the said James E. Johnson, for neglect of duty in office, of which suspension you had due notice, and by said act of suspension, you, the said James E. Johnson was prohibited from performing the duties or exercising the

functions of the said office for the period aforesaid, a copy of said order of suspension being hereto attached, marked exhibit "A;"

That afterwards, on the 26th day of November, A. D. 1892, one Edmund W. Gillen, was, after appointment by the Governor aforesaid, duly commissioned by the Governor of Florida to be tax collector in and for Duval county, until the adjournment of the next Senate, a copy of said commission being hereto attached, marked exhibit "B;"

That you the said James E. Johnson, though so suspended from said office of tax collector in and for Duval county, still retain exclusive possession of the room or office set apart in Duval county as the county tax collector's office, and still retain in your possession, custody and control all property belonging to the said office, consisting, as nearly as can be described, of the furniture belonging to the tax-collector's office in and for Duval county, and of the tax books or assessment rolls of said county, for the year 1892, with the tax assessor's warrant annexed, authorizing and empowering the collection of State and county taxes, and the tax books or assessment rolls of all preceding years, belonging to said office; also books containing blank capitation tax receipts heretofore sent to you as such former tax collector of Duval county, by the Comptroller of the State of Florida; all books and stubs containing blank tax receipts for payment of State and county taxes, and of all other books and papers ap-

pertaining to the said office of tax collector in and for Duval county, Florida; and that you, the said James E. Johnson, having possession of the said room or office, and the books, papers and furniture aforesaid, refuse to deliver possession and the custody and control of the same to the said Edmund W. Gillen, commissioned to be tax collector aforesaid, though the said Gillen has made formal demand of you, the said James E. Johnson, for the possession, custody and control of the same, as will appear by affidavit of Edmund W. Gillen hereto annexed, marked exhibit "C;"

Now, therefore, we being willing that full and speedy justice be done in the premises, do command you, the said James E. Johnson, to forthwith turn over and deliver to the said Edmund W. Gillen, as tax collector in and for Duval county, Florida, the room or office of the county tax collector of Duval county, Florida, and all furniture belonging to the county tax collector's room or office, and the tax book or assessment roll for the year A. D. 1892, with the tax assessor's warrant annexed, authorizing and empowering the collection of State and county taxes belonging to the said office of tax collector of Duval county, Florida, and the tax books or assessment rolls of all preceding years belonging to said office; and all book or books containing blank capitation tax receipts heretofore sent to you, the said James E. Johnson, as such former tax collector of Duval county,

by the Comptroller of the State of Florida, and all books and stubs containing blank tax receipts for the payment of State and county taxes, and all stubs showing tax receipts, issued for payment of State and county taxes, and all other books and papers appertaining to the said office of tax collector in and for Duval county, Florida, all of which, *viz*, the said room or office aforesaid, the said books, stubs, receipts and furniture, you, the said James E. Johnson, now have in your possession, custody and control, and refuse to turn over and deliver the same to the said Edmund W. Gillen, commissioned to be tax collector of Duval county, Florida, as aforesaid, and to the possession, custody and control of which the said Edmund W. Gillen, as tax collector in and for Duval county, State of Florida, is entitled :

Or that you do show cause why you have not done so, before the Supreme Court of the State of Florida, at Tallahassee, the Capital, at 10 o'clock on Thursday, the eighth day of December, A. D. 1892, and have then and there this writ.

Witness, the Honorable George P. Raney, Chief Justice of the Supreme Court of the State of Florida, and the seal of said Supreme Court affixed by James B. Whitfield, Clerk of said Supreme Court, at Tallahasees, the Capital, this the thirtieth day of November, A. D. 1892.

JAMES B. WHITFIELD,
Clerk of Supreme Court, State of Florida.

[EXHIBIT A.]
STATE OF FLORIDA,
EXECUTIVE DEPARTMENT.

Whereas, It has been made to appear that James E. Johnson, tax collector of the county of Duval, State of Florida, is guilty of neglect of duty in office, in this, to-wit: That on the 3d day of September, 1892, a few minutes after 12 o'clock of said day, being the last day on which poll taxes could be paid to enable a person to vote for State and county officers at the next general election thereafter, Porcher L'Engle, in behalf of William Marvin and a large number of other persons, citizens of Duval county, tendered to the said James E. Johnson, tax collector, at his office, in the city of Jacksonville, in said county, the money to pay the poll taxes for the years 1890 and 1891 for such citizens, but the said James E. Johnson then and there refused to receive the money so tendered, or note the payment of the poll taxes of the said citizens for which the same was tendered, whereby they were denied the right of suffrage at such general election.

Now, therefore, I, Francis P. Fleming, Governor of the State of Florida, by virtue of the power and authority vested in me by the Constitution of said State, have suspended and do hereby suspend the said James E. Johnson from the office of tax collector of Duval county, Florida, until the adjournment of the next session of the Senate, and the said James E. Johnson is prohibited from performing the duties or exercising the functions of the said office for the period aforesaid.

IN TESTIMONY WHEREOF, I have hereunto set my hand and have caused the Great Seal of [L. S.] the State to be affixed hereunto, at Tallahassee, the Capital, this 29th day of October, A. D. 1892.

FRANCIS P. FLEMING,
Governor.

By the Governor.   Attest:

JNO. L. CRAWFORD,
Secretary of State.

[ EXHIBIT B. ]

EXECUTIVE DEPARTMENT.
IN THE NAME AND UNDER THE AUTHORITY OF THE
STATE OF FLORIDA.

Whereas, Edmund W. Gillen hath been duly appointed by the Governor according to the Constitution and laws of said State, to be tax collector in and for Duval county until the adjournment of the next session of the Senate.

Now, therefore, reposing especial trust and confidence in the loyalty, patriotism, fidelity and prudence of the said Gillen, I, Francis P. Fleming, Governor of the State of Florida, under and by virtue of the authority vested in me by the Constitution and laws of the said State, do hereby commission the said Gillen to be such tax collector according to the laws and Constitution of said State, for the time aforesaid, and in the name of the people of the State of Florida, to have, hold and exercise such office, and all the powers appertaining thereto; and to perform the duties

thereof, and to enjoy all the privileges and benefits of the same, in accordance with the requirements of law.

IN TESTIMONY WHEREOF, I do hereunto set my hand and cause to be affixed the Great Seal of the State, at Tallahassee, the Capital, [SEAL.] this 26th day of November, A. D. 1892, and of the Independence of the United States, the one hundred and seventeenth year.

FRANCIS P. FLEMING,
Governor of Florida.

By the Governor. Attest:

JNO. L. CRAWFORD,
Secretary of State.

[EXHIBIT C.]

JACKSONVILLE, FLA., Nov. 28th, 1892.

*To James E. Johnson, Esq., City, Present:*

DEAR SIR:—This is to notify you that I have been commissioned by the Governor of the State of Florida as tax collector of Duval county, which commission bears date the 26th of November, 1892, and runs from the date thereof until the adjournment of the next session of the Senate of said State, which said commission I hereby exhibit to you for your inspection, and thereupon I make this my formal demand upon you to deliver to me possession of the office of tax collector of said county at once, together with all the books, papers, furniture and everything else appertaining thereto.

Very respectfully yours,
EDMUND W. GILLEN.

Being sworn, Edmund W. Gillen says that he delivered in person to James E. Johnson the demand, of which the foregoing is a true copy, on this the 28th day of November, 1892, and that the said Johnson refused to comply with the demands made therein.

Sworn to and subscribed before me, this 28th day of November, 1892.　　　　EDMUND W. GILLEN.

PORCHER L'ENGLE, Notary Public.

The motion to quash is upon the following grounds:

1. That the facts therein set up do not authorize the relief therein prayed, or any relief.

2. Said writ is not entitled as of any cause, nor is the name or names of the parties thereto set forth therein.

3. The facts therein set up do not as matter of law show the Attorney-General, upon whose petition it was sued out, has any interest in or relation to said writ or the relief therein prayed, as authorizes him to institute said suit.

4. From the facts therein set up, and the relief therein prayed, it appears the Supreme Court has no jurisdiction to entertain said writ.

5. From the facts therein set up and the relief therein prayed, E. W. Glllen is a necessary party to the writ.

6. That the relief prayed in and by said writ of *mandamus* can be legally had only upon *quo warranto*, or upon an information in the nature of *quo warranto*, whereby the claim of E. W. Gillen, created by the

commission therein set up, to be tax collector of Duval county, Florida, can be determined as against the *de facto* incumbent "clothed with the ostensible attributes and semblance of office."

7. It is not alleged that Johnson retains the books, room and paraphernalia of office, otherwise, or in any other right than as the actual incumbent of said office, and in the discharge of the duties thereof.

8. Said writ shows *affirmatively* that E. W. Gillen had no other right, title or claim to the books, room, etc., belonging to the office of tax collector of Duval county, now held by said J. E. Johnson, than is derived from the commission issued to E. W. Gillen under the facts set up in said writ and the law applicable thereto; and that no right, title or claim exists in Gillen thereto, which this court can entertain or adjudicate in this suit.

9. The facts therein set up do not show that the Governor of Florida, upon the facts therein set up, under the Constitution or laws of Florida, had the right to remove the said Johnson as therein set up.

10. The facts therein set up do not show under the law applicable thereto that Johnson was guilty of any offense for which he was removable under the Constitution, or that he was ascertained or adjudged to be so guilty.

11. It is not averred in said writ that the said Johnson was notified of the pendency of the charge against him for which he was so suspended, or that he had any

opportunity before said suspension to defend himself against said charge, or to produce witnesses in his defense, or to cross-examine witnesses, if any, against him.

Wherefore, and for divers other reasons apparent upon the face of said alternative writ, the said J. E. Johnson prays that said writ be quashed.

The other facts in the case are stated in the opinion of the court.

*A. W. Cockrell & Son* for the Motion.

1. The right to exercise an office is as much a species of property, as much within the protection of the law as any other thing capable of possession; and to wrongfully deprive one of it, or unjustly withhold it, is an injury which the law can redress, in as ample a manner as any other wrong. 2 Bl. Com., 263; 2 Bl. Com., 36; 4 Bac. Abr., Office, G. 297.

And this right is now within the protection of the Fourteenth Amendment, United States Constitution. Pennoyer vs. Neff, 98 U. S; Benton vs. Lytford, 37, N. H., 512; s. c. 75 Amer. D. and *Freeman's Note;* Belcher vs. Chamber, 53 Cal., 635; Foster vs. Kansas, 112 U. S., 201; Kennard vs. La., 92 U. S., 480; Mechem Pub. Off., sec. 454, *and note.*

2. The *power* to hear and determine a cause is jurisdiction; and it is "*coram judice*," whenever a case is presented which brings this power into action. But before this power can be affirmed to exist it must be made to appear:

*a.* That the law has given the tribunal capacity to entertain the complaint against the person or thing sought to be charged or affected.

*b.* That such complaint has actually been preferred.

*c.* That such person or thing has been properly brought before the tribunal to answer the charge therein contained.

3. The power to remove an officer, for *cause, can* be exercised only for just cause, and after the officer has had an opportunity for defense. Haight vs. Love, 39 N. J. L., 14.

It is elsewhere expressed thus : "The power of removal of officers, for cause, is a special authority, and must be strictly pursued." Bowman vs. Slifer, 25 Pa. St., 23.

The Constitution of 1868 provided that certain officers may be removed from office upon the recommendation of the Governor and the consent of the Senate. In Holland vs. Ledwith, a *quo warranto* proceeding brought by the Attorney-General, this court decided that this power of removal, *being without limitation*, "neither notice to the officer removed, nor the making or proving any charge are essential to its exercise."

This construction was applied to officers, whose *sole* "constituency" was the Executive.

The Constitution of 1885, under which, by virtue of his election thereto by the people of his county, Johnson, the incumbent tax collector of Duval county, sought to be "suspended" by the Governor, now

holds his office, wrought radical changes, as well in the methods by which the office was filled, as, also, in the tenure of the holding thereof.

Article VIII, section 16, reads as follows:

"The Legislature shall provide for the election by the qualified electors in each county of the following county officers: A Clerk of the Circuit Court, a sheriff, constables, a county assessor of taxes, a tax collector, a county treasurer, a superintendent of public instruction, and a county surveyor. The term of office of all county officers mentioned in this section shall be four years, except that of county assessor of taxes, county tax collector and county treasurer, who shall be elected for two years. Their powers, *duties* and compensation shall be prescribed by *law*."

And, Article IV., sec. 15, reads as follows:

"All officers that shall have been appointed or elected, and that are not liable to impeachment, may be suspended from office by the Governor for malfeasance, or misfeasance, or neglect of duty in office, for the commission of any felony, or for drunkenness or incompetency, and the cause of suspension shall be communicated to the officer suspended and to the Senate at its next session. And the Governor, by and with the consent of the Senate, may remove any officer, not liable to impeachment for any cause above named. Every suspension shall continue until the adjournment of the next session of the Senate, unless the officer suspended shall, upon the recommendation of the Governor, be removed; but the Governor may reinstate the

officer so suspended upon satisfactory evidence that the charge or charges against him are untrue. If the Senate shall refuse to remove, or fail to take action before its adjournment, the officer suspended shall resume the duties of the office. The Governor shall have power to fill by appointment any office, the incumbent of which has been suspended. No officer suspended who shall under this section resume the duties of his office, shall suffer any loss of salary or other compensation in consequence of such suspension. The suspension or removal herein authorized shall not relieve the officer from indictment for any misdemeanor in office."

The people, and not the Executive, thereby became the "constituency" of the tax collector.

The Constitution also provided for biennial sessions of the Legislature, commencing first Tuesday after first Monday in April; and the members were to be elected at the general elections.

The act of 1889, ch. 3879, Rev. Stat., sec. 156, made provision for the election by the people of tax collectors, at the *general* election of 1892, to hold office for two years.

In reference to poll taxes, the duty of tax collectors is defined in sections 341, 342, 343, 344, and 345, Rev. Stat., as follows :

"341. Assessment of Poll Tax.—A capitation tax of one dollar shall be assessed annually against every male citizen of this State of the age of twenty-one years and upwards.

"Should the tax assessor fail to assess such capitation tax against any person against whom the same should be assessed, the collector may assess the same, and may collect and receipt as in the case of other such taxes."

"342. Collector to Furnish List to Supervisors.— Thirty days prior to any general, special or municipal election to be held in this State, the collectors of revenue of each county shall furnish to the supervisors of registration in each of their respective counties a list of all persons who have paid their capitation taxes for two years next preceding the year in which any general, special or municipal election is to be held."

"343. Comptroller to Furnish Blank Receipts.— The Comptroller of the State shall furnish to collectors of taxes for each county, blank capitation tax receipts in book form, containing appropriate stubs, upon which duplicates of all receipts issued shall be kept, which receipts shall be issued by collectors of taxes to all persons upon payment of taxes hereinbefore required, and shall state the name of the party so paying, and for the year for which payment is made."

"344. List of Taxable Persons and Property.—Between the first day of January and the first day of July in each year the assessor in each county, with the aid of such assistant assessors as may be nominated by the assessor and appointed by the County Commissioners, shall ascertain, by diligent inquiry, the names of all taxable persons in his county, and also

their taxable personal property and all taxable real estate therein, on the first day of January of such year, and shall make out an assessment roll of all such taxable property. And the assessor, or his assistant, shall make at least two visits to each precinct for the purpose of receiving tax returns, after having given ten days' notice of such visit. The assessment of personal property shall be made separate and apart from the assessment of real estate.''

"345. Assessment Roll.—The assessor shall set down in the assessment roll, in separate columns, according to the best information he can obtain—

First—The names of the persons subject to poll-tax or owning personal property in the county, and the number of their district.''

The function by which one is deprived of the emoluments of his office, even for a limited time, is obviously judicial in its character, and this leads to the inquiry whether such a function belongs to the Governor of this State?

It certainly did not belong to the British crown. The King could not seize the office without inquest of office found in his favor, and could not recall his letters-patent except upon a judgment to that effect by one of the regular courts.

Police Commissioners vs. Jersey City, 36 N. J. L., 112-113.

"The question therefore is, whether the prerogative of the Governor of this State, in this respect, overtops that of the British sovereign ? If it has this reach, of course the power must be derived from the Constitution of the State.

"But the frame work of the government of this State has been too carefully constructed to leave so important a matter as this in doubt, or subject to any uncertainty. Its different departments have been nicely adjusted, and the boundaries of their action have been accurately and plainly set and established. And in no part of the instrument is the line of division between the respective branches more clearly marked than between the powers of the executive and those of the judiciary.

"By Article III the Constitution declares: 'The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial ; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided.'"

This language is almost identical, but not quite so *absolutely* inhibitory as is the language of our Constitution, Article II.

The Constitutional provision, under which it is claimed judicial power is conferred upon the Governor, is found in section 15, Article IV, hereinbefore copied.

29

It is not denied that an officer, not subject to impeachment, may be *suspended* by the Governor from office for malfeasance or other of the causes enumerated.

Nor is it denied, that functionary may by appointment fill a vacancy created by suspension or removal. But our contention is, the ascertainment of the malfeasance, or other cause, must *precede* the removal, and this ascertainment must proceed upon charges consisting of distinctly stated facts, "so that it can be determined, as matter of law, whether what the removing power treats as wrong is within the legal quality of wrong." In other words, the officer must be by the judgment of the courts, or some tribunal possessed of judicial power, convicted of misbehavior in office. "And we shall not argue," says Chief Justice Marshall, in delivering the opinion of the Court in Hardin's case, "to prove that in a government of laws a conviction whereby an individual may be deprived of valuable rights and interests, and may, moreover, be seriously affected in his good name and standing, implies a charge, and trial, and judgment, with the opportunity of defense and proof."

In Dullam vs. Wilson, 19 N. W. Rep.; 123; s. c, 53 Michigan, Campbell, J., says: "The fact, then, that the statute and the Constitution, in giving the Governor power to remove, prescribe no methods of examination, can in no way relieve him from the necessity—even if he is to pass personally on the facts—of having specific charges of misconduct communicated to the officer, and established by proof, with a

full opportunity to the respondent to examine and cross-examine witnesses, and be heard on the facts and the law."

If it be insisted that it does not appear that all the members of the court agreed with Judge Campbell, it is enough for our purpose to show that his colleagues, including Judges Cooley, Sherwood and Champlin, agreed with Judge Marshall, and that it was the presence of words in the Michigan Constitution granting to the Governor the power to *examine* into the condition and administration of the office *and the public acts of the officers,* a grant conspicuously absent from our Constitution, that authorized the Governor to exercise the *judicial* power involved in ascertaining malfeasance.

This case of Dullam vs. Wilson, grouping all the authorities on the issue herein presented, English and American, and discussing them at length, both in the opinion pronounced by the court, and for the court, and in a concurring opinion read by Judge Campbell, a member of that court, had become a *"cause celebre"* in 1883; and it must be assumed was known to the eminent lawyers composing our late Constitutional Convention, when they sought, in obedience to an extended popular demand underlying the call of that convention, of which this court will take notice as a part of the history of the times, to take from the Executive the unlimited control over appointments to

office and to abridge his power of removals from office, exercised by that official under the Constitution of 1868.

This convention certainly did not *in terms* confer upon the Governor the power, obviously a *judicial* power, to *examine into* public acts of the officers he was empowered by the Constitution to "suspend" for misconduct; and they must have been advised by the Dullam-Willson case, and the numerous well considered cases cited therein to its support, that such *judicial* power did not result, by *implication*, from the grant of power to *absolutely remove* for misconduct; and it would be unjust to the convention of 1885, and the confessedly able lawyers composing it, to assume they did *not* know that the tax collector, "being removable *only* for breach of official duty, the ascertainment of the breach must precede removal; that in a government of law, a conviction whereby an individual may be deprived of valuable rights and interests, and may moreover be seriously affected in his good name and standing, implies a charge, and trial, and judgment, with opportunity for defense and proof; "that it is a principle of natural justice which courts are never at liberty to dispense with unless under the mandate of positive law, that no person shall be condemned unheard or without an opportunity of being heard." Meacham Pub. Off., sec. 454, *and note*; Bowman vs. Slifer, 25 Pa. St., 23; s. c. 64 Amer. Dec., 680.

Does this court *know* from the allegations of this writ that what the Governor treated as wrong, was within the legal quality of wrong, constituting under the Constitution a case for removal.   It is not alleged that the Governor exercised, in any way, or claimed to exercise in any way, the judicial function involved in the determination of the legal quality of the alleged " removable " wrong.   It is *not* even alleged it was so determined, or that Johnson was charged or notified ; or was heard, or was tried and judged.

The illegality of this suspension appears from another point of view.

Says Judge Campbell in Dullam vs. Willson, N. W. Rep., 112 :

" The impossibility of sustaining the Governor's action here will further appear by comparing its necessary results with the rest of our constitutional scheme of government.   If he could remove respondent as he did, it is only because, as freely admitted by counsel, the restrictions on his power are not obligatory, and his only restraint is his sense of propriety ; or, in other words, he has unlimited discretion to do as he pleases.   No legislative session can be called during his term of office except by himself, and the removal enables him to appoint for the whole remaining term of office ; so that his nominee could only be displaced by his successor acting under the same absolute power, and in such offices as are most important, and are held

by terms of two years, could not be removed at all. If this can be done every officer of the government may be removed as soon as the Legislature adjourns, and every office can be filled by the Governor's nominees, and the whole elective system will be annulled. If this were so, it is very difficult to imagine why these offices were not made in name, as well as in fact, offices at the will of the Governor, as they might have been had it been thought proper. But a contrary design is manifest throughout. The conditions of removal are express and clear, and cannot be 1egurded as immaterial. Every office is made for a fixed term."

Under our Constitution, if this writ be sustained, the Governor is invested with arbitrary power to suspend, discharged of the supervisory control of the Senate, in every case, where the incumbent is elected at the general election, and enters upon his office in January, and holds for two years. All the Governor needs to do is to wait until the Legislature meets. He can then "suspend." And the result is, the suspension is extended beyond the duration of the term of the suspended officer unless the Governor recalls the Legislature to an extra session. And this is true of *every* officer the Constitution makes elective, Art. 8, sec. 6 ; Art. 18, sec. 10, as to that part of the tenure, intervening between the assembling of the last Legislature which sits during his term, and the expiration of his term. The entire *elective* system is practically annulled.

Sensitive to the pressure of these constitutional provisions, the Governor, as appears from the writ and the commission of Gillen thereto annexed, cuts with a single stroke of the Executive sword the Gordian knot of these constitutional limitations; he makes Johnson's suspension from, and Gillen's appointment to, the office of tax-collector of Duval county, coterminous in duration, and extends Johnson's suspension beyond Johnson's term of office, and into the *term* of Johnson's *successor*.

So flagrant to the sensibilities of the Executive was this "quality" of wrong-doing in Johnson, that he was not content with the absolute *removal* of Johnson from office; that high functionary must also *remove* from the qualified electors in Duval county the right of electing their own tax collector, which they were simple enough to believe had been secured them by Art. VIII, sec. 6, and Art. XVIII, sec. 10; and enforced, as was their trust, beyond all contingencies, partisan or what not, by the oath of office exacted of every officer of this State, to *protect* and *defend* the Constitution of the State, Art. XVI, sec. 2.

*Thus*, an out-going Governor has sought to fill in part an office that did not become vacant during the term of *his* official life; Brown vs. Meehan, 45 N. J. L. 189; an office which did not even "*fall in*" during his incumbency; the term of which does not *even begin* until the close of his official life.

The commission to Gillen is absolutely void. Hench vs. State, 72 Indiana, 297.

But our Constitution framers can not, by any fair construction, be involved in such inconsistency.

That the convention that framed the Constitution of 1885 differentiated suspension and removal from office, is obvious from the terms employed; that it was intended to *limit* the grant to the Executive, in respect of displacement from office, to the power to *suspend*, as *so* differentiated from the power to remove is *also* obvious. As the duration of the displacement of Johnson is extended by its terms *beyond* the term for which Johnson was elected, it is in substance and in fact a "removal" from office instead of a "suspension" from office, in the sense of the constitutional differentiation, which the Governor has attempted to accomplish in this case.

Apart from the use of the terms "suspension" and "removal," as correlated in the Constitution, the every day meaning attached in this connection to "suspend" is to create an *interval*, between fixed termini of time, in the holding of an office, for which *interval* the officer relaxes, and thereafter *resumes*, the tenure of the office; relaxation and resumption are necessarily correlated in suspension.

Webster defines "suspend" to mean "to cause to cease for a time."

The Supreme Court of Kansas, March 9, 1889, in Metsker vs. Neally, 21 Pac. Rep., 206, s. c. Kan., says:

"We can readily believe the greater power to remove might include the  lesser, to suspend; but we have failed to notice any instance where the power to remove is not conceded, the authority to suspend is admitted."

This *limitation* of the grant to the Executive to the power to suspend *as* distinguished from the power to remove is made evident from another view.  Giving effect to *every* part of this constitutional enactment, as we are obliged to do, it appears therefrom that in *every* case in which the Governor is *thereby* empowered to suspend, resumption by the suspended officer of his official duties *must* follow the Senate's *refusal* to remove, or *failure* to take action, before its adjournment.  This involves, of necessity, a limitation upon the grant to the Executive of the power to suspend.  He can *suspend* only in such cases as the Senate may *refuse* to remove, or may *fail* to take action *thereon*, before its adjournment.

Again, the Constitution clearly contemplates that *no* officer, suspended by the Governor, under its authority, "shall suffer any loss of salary, or other compensation, in consequence of such suspension," unless by the refusal of the Senate to remove, or failure to take action on the "suspension" before its adjournment, he is *restored* to the right to resume the duties of the office, and *fails* to resume the duties of the office.  Now, if the Governor can, in any case "*suspend*" an officer from office beyond the duration of its term, as fixed by law under the Constitution, he can

*arbitrarily* deprive an officer of his salary, and *overthrow* the constitutional authority of the Senate to *protect* the officer from loss of salary entailed by "suspension."

Certainly, if the Governor's power of suspension is *confined* to such officers as the Senate, to whom the cause of suspension is to be communicated at its next session, shall remove from, or refuse to remove from office, it cannot be extended by construction to cases in which the *term* of the suspended officer has expired by its own limitation, *before* the act of suspension has ceased to be *operative;* and in respect of which suspension the Senate can *not act,* because he is become a private citizen, having no office to be removed from, when the Senate meets; and to which he can not *possibly,* under any conditions, be *restored.*

This alternative writ, considered in the light of the functions it is required to perform in this case, and the parties to it, presents in its construction legal difficulties which cannot be surmounted without overturning established principles of procedure.

It sufficiently appears from the allegations of the writ, which performs the function of writ and declaration, and which like any other pleading is to be construed most strongly against the pleader:

1. That Johnson was *de jure* the tax collector of Duval county, and was in the actual discharge of the duties of that office on the 29th day of October, 1892.

2. That but for the "alleged" suspension, set up in the writ, Johnson is *now* such officer, both *de jure* and *de facto*.

3. That he is *now* the actual incumbent of that office, in possession of its paraphernalia, books, and the room set apart for the transaction of its business, clothed with the ostensible attributes and semblance of office, and now actually discharging duties or functions appertaining thereto, from the performance of *any* of which he was in terms interdicted, or prohibited or sought to be interdicted and prohibited by an Executive order, incorporated in the act of suspension.

4. It is not alleged that Johnson retains the books, room, paraphernalia, etc., the possession of which he is mandamused to deliver to *Gillen*, otherwise, or in any other right, than as the actual incumbent of said office and in discharge of the duties appertaining thereto.

5. It does affirmatively appear that whatever right or title Gillen has to receive such room, books, etc., is derived from the alleged suspension of Johnson, and the interdiction put upon him, the said Johnson, by the Executive order, set up in said writ; the alleged commission to Gillen set up in said writ, *and* the demand made by Gillen, therefor, as set up in said writ.

It is clear, therefore, whether the action of the Governor, in suspending Johnson from office, and inter-

dicting him to perform any of the duties thereof, be legal or not, no right accrues to *Gillen* to make the demand that was made, or to receive the property that was demanded, nor was there any obligation upon Johnson to make surrender to *Gillen* of said books, etc., unless it is also shown as matter of law applied to the facts recited in the writ, that Gillen was duly and legally commissioned by the *commission* that was, in fact, as set up in the writ, issued to him.

All these issues must be decided adversely to the views of the respondent before the court can as matter of law adjudge the alternative writ must be made peremptory.

Now we insist that issues of the gravity of these, involving so many delicate and important questions of constitutional law, cannot be tried in a mandamus proceeding of the character of this one; and to which E. W. Gillen, the claimant of the possession of the property involved, is *not* a party, in name or in fact, and, of consequence, the judicial determination of which can in no way conclude him.

The writ, in its present shape, is so constructed as to perform the functions merely of a writ of replevin, exclusively cognizable in the Circuit Court; and while Gillen, we insist, *is* a necessary party to any proceeding of this character, the Attorney-General has no such relation to, or interest in it, as to authorize *him* to institute it. Conceding, indeed affirming, that if this was a *quo warranto* proceeding, or an informa-

tion in the nature of a *quo warranto*, to test the claim of an appointee of the Governor seeking *induction* to office by virtue of said appointment conflicting with a claim of an incumbent *de facto*, claiming to be also a *de jure* incumbent, it would be within the prerogative of the Attorney-General on the relation of Gillen to institute it, and of the Supreme Court to entertain it; we insist, that *not* being such a proceeding, the Attorney-General can *not* institute it, nor can the Supreme Court entertain it.

A careful examination of the adjudged cases, has failed to discover a single authority in which the Attorney-General was permitted to institute a suit of this kind; nor any case in which such a proceeding was instituted by another than the party claiming the possession.

The rule is well settled that the acts of an officer *de facto* are valid, as respects the public and the rights of third persons, and it is not allowable to assail the title of such officer in a collateral proceeding; citing 5 Hill, 616.

Lambert vs. People, 76 New York, 231.

"No principle is better settled in the law than that a mandamus will only lie where there is no other remedy, and that where the applicant has a clear legal right to the remedy sought. The books are full of cases which support this doctrine, and it is unnecessary to cite authorities to uphold a principle so familiar and so well understood. That the relator has an-

other remedy, if he has any right, by *quo warranto*, is quite clear ; and if another person has usurped and claims to hold an office to which he is entitled, there is usually no difficulty in obtaining redress in that form. The legal presumption is that a full opportunity will be given to assert a legal right, if any he has, in accordance with the ordinary course of procedure in such cases ; or, if permission to do so cannot be obtained, that sufficient reasons exist for refusing the same by the Attorney-General, who as the law officer of the State, has the power to make application to the court that the writ be issued.

"None of the cases to which we have been referred, uphold the position that a mandamus is a proper remedy where, as in the case at bar, there is a serious question as to the right of the relator, and another person holds and exercises the functions of the office claimed which is an established fact.    *   *   *   It was settled at a very early stage of its (*i. e.* New York's) judicial history, that when one person is already an officer by color of right, the court will not grant a mandamus to admit another person who claims to have been duly elected, and that the proper remedy is by an information in the nature of a *quo warranto*." (3 Johns. cases, 79).    This doctrine has since been approved and upheld by repeated decisions, and has become settled law.   (5 Hill,. 616, 3 Denio, 396).

Re Gardner, 68 N. Y., 467.

"Indeed it is doubtful whether the title to an office ought ever to be tried collaterally on proceedings by

mandamus instituted in behalf of a party out of possession"—citing 5 Hill, 616.

55 N. Y., 219.

"Mandamus issues *only* to compel the recognition of a clear legal right or the performance of a legal duty; it does not issue so long as the right or the duty is *disputed* or doubtful." Jacobs & Chaney's Mich. Dig., Vol. 2, pp. 102-3, sec. 14; Peck vs. Kent Co. Sup., 11 N. W. Rep., 279; s. c. 47 Mich., 477.

High thus states the doctrine :

"But if it be apparent to the court that, instead of a proceeding whose object is only to get possession of the books and insignia of an office, the writ is invoked, in reality, to test the title to the office and that the question of title is the real point in issue, it will refuse to lend its aid by mandamus. In all such cases, eth parties will be left to a determination of the disputed questions of title by proceedings upon information in the nature of a *quo warranto*, since this is the only remedy in which judgment of ouster can be had against an actual incumbent, and the person rightfully entitled can be put into possession of the office. The court will not, therefore, upon an application for a mandamus to procure possession of official records, inquire into the right of a *de facto* incumbent of the office, and if it is apparent that the relator's rights can not be determined without such an investigation into respondent's title, mandamus will not lie."
High's Extra. Leg. Rem., Sec. 77.

"Nor will courts by mandamus compel delivery of books and papers when there is any doubt as to the title to the office, and will send the relator to his *quo warranto* to try the right." In People *ex rel*. Brewster and Jones vs. Kilduff, 15 Ills., 492, the court by mandamus compelled an ex-mayor to deliver the seal of office to the mayor elect; but in the opinion, rendered by the Supreme Court of Illinois, state as follows : "A *quo warranto* is the proper writ to try the question of title to the office. But this writ (mandamus) is not asked for this purpose. It is asked to deliver to the mayor elect and qualified, the seal, the insignia of office. And to defeat the application and prevent the issuing of the writ for that purpose, this *groundless, colorless claim* is set up to the office itself, and the party's *pretended* intrusion into, or retention of it, is sought to create *such a doubt of the true title*, or *controversy about it*, as to justify the withholding of the writ and sending of the informant to his *quo warranto*;" thus admitting that in case of "doubt of the true title," *mandamus* would be withheld and the relator sent to *quo warranto* to try the right. The decision of the same court in case of People *ex rel*. Cummings vs. Head, 25 Ills., 325, granting *mandamus* for delivery of books and papers to a clerk elect, is evidently upon the same principle, although sometimes cited as authorizing delivery of books and papers to *any* holder of the *prima facie* title to an office, regardless of doubts as to the true title. The facts are not fully stated in the opinion rendered, but after quoting from the opinion in 15

Ill., 492, the exact language herein above quoted, the court say: "These reflections are as pertinent to this case as any well can be, and hence we quote them." Hence, we must infer there was no "doubt of the true title," or "controversy about the title," in this case to justify the withholding of the writ and sending the relator to his *quo warranto*. So, doubtless, upon the same principle, a judge, upon motion merely, might order an officer of his court to deliver books and papers to a successor, where it appears from the hearing that he has but a "groundless and colorless claim" to the office, as in the cases last above cited. But this the judicial mind only should be allowed to determine.

We submit the writ should be quashed.

*The Attorney-General, contra.*

Section 15 of Article IX of the Constitution vests in the Governor the power to supend for causes therein specified "all officers that shall have been appointed or elected, and that are not liable to impeachment." Among the constitutional grounds of suspension is "neglect of duty in office."

Upon such removal the Governor must communicate to the officer so suspended, and to the Senate "at its next session, * the cause of suspension."

On the 29th day of October, 1892, the Governor suspended from the office of tax collector of Duval

30

county, Florida, James E. Johnson, for "neglect of duty in office," and communicated to him "the cause of suspension."

The Governor afterwards appointed Edmund W. Gillen to be tax collector of Duval county, Florida, in place of James E. Johnson, and on the 26th day of November, 1892, a commission regularly issued to Edmund W. Gillen. Johnson refuses to turn over and deliver the office, or room, of tax collector in Duval county, to Gillen, and refuses to deliver to him the books, etc., of the office, though formal demand has been made by Gillen on Johnson for both.

## I.

The Governor had the right and power to suspend Johnson for the cause he assigned—"neglect of duty in office"—and no previous notice is required by the Constitution to be given to Johnson before the act of suspension. Such act of suspension is the exercise of Executive discretion, is a political act of a co-ordinate department of the government, and this court will not review the act of the Governor. The power thus exercised by the Governor is administrative, and not judicial. If notice is required, enough is disclosed by the writ herein to justify the court in granting the relief prayed. Officers are presumed to do their duty, and if notice is required, and was not given, it is matter of defense to respondent herein. Donahue vs. County of Will, 100 Ill., 94; State ex rel. Attorney-General vs. Hawkins, 44 Ohio St., 98; State vs. McGarry, 21 Wis., 496; State vs. Prince, 45 Wis., 610;

Keenan vs. Perry, 24 Texas, 253; State vs. Doherty, 25 La. Ann., 119; Taft vs. Adams, 3 Gray, 128; *Ex parte* Wiley, 54 Ala., 226; Thompson vs. Holt, 52 Ala., 491; State vs. Frazee, 48 Ga., 137; Patton vs. Vaughn, 39 Ark., 211; State *ex rel.* Bisbee vs. Drew, 17 Fla., 67.

## II.

Notice to Johnson was not necessary. *Ex parte* Wiley, 54 Ala., 226.

## III.

Mandamus is the proper remedy in this case. The proceeding merely seeks to give to Gillen possession of the office, the books, etc. *Quo warranto* is not the proper remedy. That proceeding seeks to adjudicate the title to the office. In such a proceeding the judgment is ouster. Even now Johnson's title to his office is not destroyed: it is merely *suspended*. The Governor can, if he so elect, restore Johnson to his office *to-day*. The Governor can remove only with concurrence of the Senate. The Senate must act on his order of suspension and sustain it, to make it effectual against Johnson; otherwise Johnson *resumes* his office if his term is not expired. The officer so suspended, if restored by the Senate's non-action, or non-approval of the Governor's act, loses none of his compensation for the time of his suspension. Gillen here has the *prima facie* title which this court will recognize, and Johnson's obligation to turn over the office, books, etc., is a *ministerial duty*. Johnson is not a *de facto* officer, holding by *color of right*. His holding is *merely colorable*; he holds the office, books, etc.,

without any legal right, he being notified of his suspension. The Governor's power to act being conceded, and he having acted, leaves Johnson no standing, such as enables him to claim that he is holding *colore officie.* Mandamus is the only adequate remedy in this case, because it is the only speedy method of placing the office, books, etc., in the possession of Gillen. State *ex rel.* Law vs. Saxon, 25 Fla., 792, 6 South. Rep., 858; State *ex rel.* Fleming vs. Crawford, 28 Fla., 441, 10 South. Rep., 118; Thompson vs. Holt, 52 Ala., 491; State vs. James, 19 Neb., 161; State vs. Walker, 19 Neb., 444; Clarke vs. Newton, 49 N. J. (Law), 349; State *ex rel.* Freeholders, 35 N. Y., (Law), 269; Alberton vs. Sherwood, 15 Minn., 221; State *ex rel.* vs. Clarke, 52 Ill., 508; Norwood vs. Marshall, 9 Md., 83; People *ex rel.* vs. Head, 25 Ill., 325, (see last page of decision); O'Donnel vs. Dusman, 39 N. J., (Law), 679.

### IV.

Where the Attorney-General brings mandamus, the petition need not be sworn to. Woodruff vs. N. Y. & N. E. R. R. Co., 59 Conn., 63; State vs. Wilmington Bridge Co., 3 Harrington, 312.

### V.

The Attorney-General is the proper relator herein. Gillen is not a neccessary party. Attorney-General vs. City Council of Lawrence, 111 Mass., 90; State vs. Wilmington Bridge Co., 3 Harrington, 312; Welter vs. Belding, 24 Vt., 658; State *ex rel.* Fleming vs. Crawford, 28 Fla., 441, 10 South. Rep., 118.

RANEY, C. J.:

The Governor, the administrative officers of the executive department, justices of the Supreme Court and judges of the Circuit Court are liable under sec. 29, Article III, "Legislative Department," of the Constitution of 1885, to impeachment for any misdemeanor in office; but by sec. 15, Article IV, "Executive Department," "all officers that shall have been appointed or elected, and that are not liable to impeachment, may be suspended from office by the Governor for malfeasance or misfeasance or neglect of duty in office, for the commission of any felony, or for drunkenness or incompetency, and the cause of suspension shall be communicated to the officer, and to the Senate at its next session. And the Governor, by and with the advice of the Senate, may remove any officer not liable to impeachment for any cause above named. Every suspension shall continue until the adjournment of the next session of the Senate, unless the officer suspended shall upon the recommendation of the Governor be removed; but the Governor may reinstate the officer so suspended upon satisfactory evidence that the charge or charges against him are untrue. If the Senate shall refuse to remove or fail to take action before its adjournment, the officer suspended shall resume the duties of the office. The Governor shall have power to fill by appointment any office, the incumbent of which has been suspended. No officer suspended who

shall under this section resume the duties of his office shall suffer any loss of salary or other compensation in consequence of such suspension. The suspension or removal herein authorized shall not relieve the officer from indictment for any misdemeanor in office."

Tax collectors are county officers, and are chosen by the duly qualified electors of each county, and their term of office is two years. Section 16, Art. VIII, Constitution. All county officers continue in office until their successors are duly qualified. Section 14 of Art. XVI. The Governor is authorized to fill vacancies. Advisory Opinion, 25 Fla., 427. The present term of respondent expires with the commencement of the next regular term, on the first Tuesday after the first Monday in the coming January, A. D., 1893. Sections 10 and 14 of Art. XVIII.

Tax collectors being within the policy of sec. 15 of Art. IV of the Constitution set out above, the construction of such section, to the extent of the questions presented by the record, is necessary. There are two contentions on behalf of respondent which will be disposed of primarily. The first is: That the power of suspension given to the Governor can not be exercised by him until there has been an ascertainment "by the judgment of the courts or some other tribunal possessed of judicial power," of the existence of one or more of the causes for which suspension is authorized by the designated section. The power to make the inquiry and decide upon the existence of that which is "within the legal quality of wrong" for which

suspension may be inflicted, is claimed to be judicial in its nature, and not within the official attributes of the Governor. Our judgment is that whether the power be strictly judicial, or, on the contrary, administrative in its character, it exists *in the Governor*. Moreover it is indisputable that if there is an adjudication anywhere, which, under a constitutional provision professing, like ours, to give the power of suspension or removal to a Governor or other executive or administrative functionary, holds that such functionary has not the power to inquire into and decide upon the existence of the cause of removal, it has not been presented by counsel ; nor has one been found by us in our own researches.

The last observation and the importance of the principle involved necessitate a presentation of the authorities relied upon by counsel for respondent. We will consider them in the order in which they appear in the brief. The decision in State *ex rel.* Police Commissioners of Jersey City vs. Pritchard *et al.*, 36 N. J. (Law), 101–119 (cited as Police Commissions vs. Jersey City, 36 N. J. L., 112–113), is, as summarized in the head-notes: 1st, that the right to remove a State officer for misbehavior does not appertain to the executive office ; that such act is judicial, and belongs to the court of impeachment; 2d, certain police commissioners of Jersey City, appointed by statute, having been convicted upon indictment of conspiracy to cheat the city, and the Governor having declared their offices to be thereby vacated, and having appointed their successors, it was held that the executive action was

illegal and void. The opinion clearly shows that no provision of the Constitution, nor of any statute, professed to give the Governor the power of removal or suspension, and that the law did not give the conviction the effect of forfeiting the office, but that under the Constitution the jurisdiction to vacate the office was in the court of impeachment, in which the Constitution invested a part of the judicial power of the State, the Senate having the power of trial, and the Assembly the right to impeach. Another case cited is that of Dullam vs. Willson, 53 Mich., 392, decided in the year 1884, where the removal was for "official misconduct and habitual neglect of duty." By an amendment made in 1862 to the Michigan Constitution, it was ordained :

"The Governor shall have power, and it shall be his duty, except at such times as the Legislature may be in session, to examine into the condition and administration of any public office, and the acts of any public officer, elective or appointed, to remove from office for gross neglect of duty or for corrupt conduct in office, or any other misfeasance or malfeasance, either of the following State officers, to-wit: The Attorney-General, * * or any other officer of the state, except legislative and judicial, elective or appointed, and to appoint a successor for the remainder of their respective unexpired term of office, and to report the cause of such removal to the Legislature at its next session." The opinion delivered by Judge Champlin holds unequivocally that the power of removal can be exercised only for the specific causes mentioned in the

JUNE TERM, 1892. 473

The State of Florida ex rel. v. J. E. Johnson.—Opinion of Court.

amendment, and upon specific charges of the partic ular acts relied on to make out the causes, and upon reasonable notice and opportunity for a hearing, and that the Governor has judicial power to examine into and pass upon the charges. He says: "It is only when the causes named exist that the power conferred can be exercised. It follows as a necessary conse- quence that the fact must be determined before the re- moval can be made; * * * and the first question is, what is the proper tribunal in which such facts as are to be ascertained. In my opinion this provision of the Constitution requires no legislation to make it ef- fective. Read in the light of the history of the times, and the surrounding circumstances when it was adopted, the grant of power is to the Governor, coupled with the duty enjoined to examine into the acts of any public officer, and to remove from office for gross neglect of duty or for corrupt conduct in office, any of the officers specified. The amendment for this pur- pose clothes him with judicial power. It is implied in the grant, and without it the grant would be nuga- tory and ineffectual to accomplish the purpose for which it was given." Again he says that the amend- ment, in effect, gives the Governor "the right to try the question whether the officer is guilty or not, and to remove him from office." There is in the opinion nothing inconsistent with these views. At the foot of it we find the following: "Sherwood, J. concurred. Cooley, C. J.: I concur, both as to the right of the respondent to be heard upon charges, and as to the power of the Governor under the Constitution to de-

cide upon the charges." Then follows the opinion of the fourth judge, Campbell, and he alone asserts the view that any court proceeding was necessary; and whereas he concurs with the other judges in a judgment for the respondent on the ground that respondent had had no notice or opportunity for a hearing, still his views affirming the necessity for a proceeding in court are entirely antagonistic to those as to the sole power of the Governor to determine the existence of the cause for removal, asserted by the court through a majority of its judges, and for which the adjudication is an authority. Of the other case relied on in this connection, Page vs. Hardin, 8 B. Mon., 648, it is only necessary to say that, like the one from New Jersey, *supra*, there was no pretense of grant of power of removal or suspension, to the Executive; and, considering the differences of organic law, its conclusion that the power of removal was confined to the court of impeachment is, like that in the New Jersey case, not in conflict with the judgment of the majority of the Michigan court, in Dullam vs. Willson. Viewed in the light of the designated difference in the Constitutions of Michigan and those of New Jersey and Kentucky, there is no real contrariety of views or judgment to be found in the opinions of the three *courts*, excluding of course Judge Campbell's opinion as to the necessity for action by a court where there is a special grant to the Governor of power to remove as in Michigan.

. That the grant of such a power as has been conferred upon the Governor by the section under consid-

eration, invests him with the power to investigate,
and to decide as to the existence of any of the causes
for which a suspension of an officer may be made,
seems to us beyond controversy in the light of common
reason; which it is upon the authorities. Had it been
the purpose that the suspension should take place
only upon the ascertainment by a court, or other distinct tribunal, of the existence of the cause for suspension, it doubtless would have been made the necessary duty of the Governor to suspend upon such ascertainment, or such ascertainment would have given the
effect of working, *ipso facto*, a suspension. It would
not have been left to the discretion of the Governor
to suspend or not, after the supposed tribunal had
made its finding; nor would such finding have been
subjected to the review and reversal which must be,
and as we understand is, conceded to be, reserved to
the Governor in the power "to reinstate the officer so
suspended, upon satisfactory evidence that the charge
or charges against him are untrue." Certainly the
only status which could be claimed for such court or
tribunal would be that of merely an advisory body,
and the Governor would have an appellate or supervisory, but not an original, jurisdiction to ascertain
the truth of the charges. It is moreover a fact that
the convention of 1885 rejected the following propositions: One, that county officers should be removed
for incompetency, willful neglect of duty, malfeasance,
misfeasance, drunkenness, gambling and any violation

of the criminal laws of the State *upon conviction in the Circuit Court* after indictment by the grand jury of the county, the officer to be suspended from the performance of his duties upon the filing of the indictment, and the Governor to appoint a person to perform the duties of the office pending the judicial proceedings, and with further power in the Governor, when no grand jury was in session, to suspend the officer charged with such offenses, if he should think a case was made upon the papers presented to him. Another, that all officers not liable to impeachment might be suspended or removed from office by the Executive in such manner, and for such causes, as might be prescribed by the Legislature. And another, that the County Commissioners should have the power to suspend county officers for habitual drunkenness, neglect of duty, incompetency, and the commission of felony; the board to give notice of the charge and of the time and place of trial, and to declare the office vacant if the charge was sustained on the trial, and the Governor, thereupon, to order an election to fill the vacancy; and such trial to be within thirty days from service of the notice. And another, that the suspension by the Governor should be upon a recommendation of the grand jury of the county, setting forth the charge against the officer; and still another, that the suspension should be after conviction by due course of law. *Vide* Journal of Constitutional Convention of 1885, pp. 119, 120, 134. The conclusion that the intention was to lodge in the Chief Executive, and in him alone,

the exclusive power to investigate and decide, is to our minds irresistible when we consider the express grant of the Constitution to suspend for cause and reinstate, and the rejection of propositions to give the power of trial to other tribunals, including the courts.

The authorities are all to the effect that a grant of the power to remove, either for cause or at discretion, carries with it the exclusive power to hear and decide; and whereas the courts are entirely powerless where the power is discretionary, they are equally so where it is for cause, if the grantee of the power acts within its limits, and upon notice, if notice is required; if the removal is for a cause designated by or following within the grant, the grantee or depositary of the removing power is the sole judge of the sufficiency of the evidence to justify the removal. That such is the case where the power is discretionary, is settled by this court in State *ex rel.* Holland vs. Ledwith, 14 Fla., 220. In State *ex rel.* vs. Doherty, 25 La. Ann., 119, where the executive power of removing the officer was "for refusing or failing to do his duty as prescribed by this act," it was said : "The grant of power to the Executive to remove an officer for a certain cause implies authority to judge of the existence of the cause. The power vested exclusively in executive discretion can not be controlled in its exercise by any other branch of the government." In State *ex rel.* Attorney-General vs. Hawkins, 44 Ohio St., 98, the decision was that where charges embodying facts which, in judgment of law, constitute official miscon-

duct, are preferred to the Governor, of which notice is given the members charged, and he acting upon the charges so made removes them from office, his action is final and can not be reviewed or held for naught by the courts on a proceeding in *quo warranto*, whether he erred or not in exercising the power conferred upon him. And in Keenan vs. Perry, 24 Texas, 253, where the Governor was given power of removal for certain enumerated causes, the decision was that no principle is more firmly established than that where a special and exclusive authority is delegated to any tribunal or officer of the government, and no mode of revising his decision by appeal or otherwise is provided by law, his action is final and conclusive of the matter, and the law makes him the sole judge of the existence of the cause of removal. Dixon, C. J., speaking for the court in State *ex rel.* vs. McGarry, 21 Wis., 496, a *quo warranto* proceeding, where a statute gave a board of supervisors power to remove for incompetency, improper conduct or other cause satisfactory to such board, said: "We are clearly of opinion that the power of the board is absolute and its determination final when acting within the scope of the power. The board may remove for incompetency, improper conduct or other cause *satisfactory* to the board. By 'other cause' we understand other kindred cause showing that it is improper that the incumbent should be retained in office. If the board should attempt to remove him for some cause not affecting his competency or fitness to discharge the duties of the office, that would be an excess of power, and not a removal

within the statute. It would be equivalent to removing him without assigning any cause—a merely arbitrary removal, which the statute does not authorize. The cause must be one which touches the qualifications of the officer for the office, and shows he is not a fit or proper person to perform the duties; and when such cause is assigned, the power to determine whether it exists or not is vested exclusively in the board, and its decision upon the facts can not be reviewed in the courts. The only question of judicial cognizance is whether the board has kept within its jurisdiction, or whether the cause assigned is a cause for removal under the statute." See also State *ex rel.* vs. Common Council of Watertown, 9 Wis., 254; State *ex rel.* vs. Prince, 45 Wis., 610; State vs. Frazier, 48 Ga., 137; Patton vs. Vaughn, 39 Ark., 211; Donahue vs. County of Will, 100 Ill., 94; *Ex parte* Ramshay, 83 Eng. Com. Law, (18 Ad. & E., n. s.), 173.

The contention that the power of suspension can not be exercised by the Governor for the reason that it is judicial, is clearly untenable. It is true that the second article of our organic law divides the powers of government into three departments, legislative, executive and judicial, and declares that no person properly belonging to one department shall exercise any powers appertaining to either of the others except in cases expressly provided for by this Constitution. The Constitution of Michigan contained a similar provision, (Charters and Constitutions of U. S., 996),

and vested the judicial power in designated courts
(*Ibid*, 1001); and the amendatory provision, set out
above, was added not to the executive or judicial ar-
ticles or departments, but to the "impeachments and
removals from office" article, and the Supreme Court
of that State held, in Dullam vs. Willson, *supra*, that
it was a judicial power, but was to be exercised, as in-
dicated *by the Governor*. If the framers of our Consti-
tution are, as claimed by counsel, to be charged with
notice of this decision, when acting in convention,
they must be accorded a knowledge of the conclusions
of the *court*, which both affirmed the validity of a
grant like that made to our Chief Executive, and
held that the judicial power to hear and decide was
implied in the grant; and the ordinary professional
and lay judgment must be that the makers of our Con-
stitution based their action upon the adjudication
which sustained their work, rather than on a dissen-
tial view which is entirely fatal to its efficiency.
There are authorities which hold, and with force, that
such power when vested in a functionary of the execu-
tive department of the government, is not judicial in
its nature. State *ex rel.* vs. Hawkins, Donahue vs.
County of Will, *supra.* It is however, entirely un-
necessary to ascertain whether the nature of the
power is strictly judicial, or *quasi* judicial, or admin-
istrative, or what is its precise classification, since we
are altogether satisfied that it is not a power given to
the courts by the fourth, or judiciary, article, which

provides that the judicial power of our State shall be vested in the courts there designated. If the power is judicial in its character, the fact nevertheless is that it has been given to the Governor by the section of the executive article under discussion, and not to the courts, and the Governor exercises it as a member of the executive department of the government, and not as a court, or member of the judiciary department; and the courts enumerated in the judiciary article, sections 1 and 34, as the depositories of the judicial power of the State, can not exercise it any more than they can the power of trying an officer under impeachment; and for any such court to attempt it would be a no less bald usurpation of the constitutional power of the Chief Executive, than an attempt to entertain an impeachment trial would be a lawless assumption of the exclusive functions of the Senate, under the 29th section of the legislative article, to try impeachments.

II. The second of the questions claiming primary consideration is that of the necessity for notice to the officer, of the charges, and an opportunity for a hearing, before the suspension. The alternative writ does not allege such notice on hearing (King vs. Gaskin, 8 Term R., 209), and hence it is insufficient if the notice is necessary.

Under the Constitution of 1868, all executive and judicial officers, except the Governor and Lieutenant-

Governor and constables, were appointed by the Governor, or by him with the concurrence of the Senate. The Governor, Lieutenant-Governor, members of the cabinet, Judges of the Supreme and Circuit Courts, were subject to impeachment, the trial being by the Senate, and removal from office following conviction. Section 29, Art. IV, Legislative Department. The same section provided that all other officers who should have been appointed by the Governor, by and with the advice of the Senate, might be removed from office "upon the recommendation of the Governor and consent of the Senate." The 18th section of the fifth, or executive article, made assessors of taxes and collectors of revenue, who were appointed by the Governor, with the consent of the Senate, and whose terms were two years, removable upon the recommendation of the Governor and consent of the Senate, and ordained that county treasurers, county surveyors, superintendents of common schools and county commissioners, whose terms were each two years, were subject to be removed by the Governor "when in his judgment the public welfare will be advanced thereby; *provided*, no officer shall be removed except for wilful neglect of duty, or a violation of the criminal laws of the State, or for incompetency." Justices of the peace were appointed for four years, and were removable by the Governor "for reasons satisfactory to him." County judges, state attorneys, sheriffs, and clerks of the Circuit Court were appointed in the

same manner, but for four years (sections 9 and 10, judiciary article), there being, however, no provision as to their removal other than in section 29 of Art. IV, *supra*. State *ex rel*. Holland vs. Ledwith, *supra*.

Such, as to the subject in hand, was the condition of the organic law which the convention of 1885 was called to revise. Revision was the purpose of the convention, and it so understood. Journal, p. 31; State *ex rel*. vs. George, 23 Fla., 585, 3 South. Rep., 81. It is plain that in some cases the old instrument gave the Governor and Senate a joint power of removal that was entirely discretionary (State *ex rel*. vs. Ledwith), and in others this power was in the Governor alone and for cause, whereas, in the case of justices of the peace it was a matter of his sole and unlimited official discretion. That it is held by authorities of high character that the power to remove an officer *for cause* can be exercised only after notice and hearing, is unquestionable. King vs. Gaskin, *supra*; Queen vs. Archbishop of Canterbury, E. & E., 545; Dullam vs. Willson, *supra*; State *ex rel*. Dennison vs. City of St. Louis, 90 Mo., 19; Field vs. Commonwealth, 32 Penn. St., 478; State vs. Bryce, 7 Ohio, 367; People *ex rel*. vs. Whitlock, 92 N. Y., 191; Biggs vs. McBride, 17 Oregon, 640; Mechem on Public Officers. sec. 444. No notice is necessary either where the officer's tenure is at the pleasure of the appointing power, or where he holds for a particular term, and the power of removal is discretionary. Mechem, sec.

454; Sweeney vs. Stevens, 46 N. J. (Law), 344; People ex rel. vs. Whitlock, 92 N. Y., 191. Of course the authority which lawfully creates an office has full power to make the incumbent removable at the mere will of the appointing power, or for cause. State ex rel. vs. Ledwith; People ex rel. vs. Whitlock, Sweeney vs. Stevens, supra; Mechem, sec. 454. There is, however, authority which holds that no notice is necessary even where the power of removal is limited to designated causes. State ex rel. vs. McGarry, supra. Mechem also puts this construction on Patton vs. Vaughn, 37 Ark., 211, and State vs. Doherty, 25 La. Ann., 179.

From what is said in the next preceding paragraph it necessarily follows that it was entirely competent for the framers of the organic law to have prescribed whatever conditions as to removal or suspension may have seemed advisable, and the adoption of them by the people in ratifying the Constitution would have made them the law of the land; and no incumbent of the office could be heard to complain of their enforcement. It is, moreover, altogether clear that the Governor has not been given any sole power of removal. Whereas he may suspend an officer from the performance of the functions of his office until the Senate shall act at its next session, he has no exclusive power to remove him or deprive him of the future emoluments of his office. All such power existing under the

former Constitution has been taken away, and the function of the Governor in a recess of the Senate is limited and clearly defined. Where, in the performance of the duty enjoined upon him by the mandate to "take care that the law be faithfully executed" (sec. 6, Art. IV, Const. 1885), he in the exercise of a fair and just official judgment, finds that there is the misfeasance or malfeasance or neglect of duty in office, or the drunkenness or incompetency which, in the light of the public good, requires *the removal of the officer*, or where there has been the commission of a felony, the Constitution contemplates that the suspension shall be made. And though this power of suspension might have been bestowed without any right of hearing in the officer, or with the right of hearing before there could be any exercise of the power, neither course has been pursued. The provision that the Governor "may reinstate the officer so suspended upon satisfactory evidence that the charge or charges against him are untrue," was not intended to merely give an arbitrary or wilful discretion to the Executive to make inquiry or not as might please a caprice or a prejudice, but it was both to impose upon him the duty of hearing evidence upon the charge and to secure to the suspended officer the constitutional right to be heard by the Governor upon the charges which the latter has communicated to him upon suspending him. It is as much the duty of the Governor on suspending an officer to notify him of the cause of the suspension, or charge upon which he has been sus-

pended as it is to suspend when the facts of a partic
cular case. viewed in the light of the public weal, de-
mand removal; or as it is to refuse to suspend when
they do not seem to demand removal or to reinstate
when under a misapprehension he may have errone-
ously suspended an officer. By this provision last
quoted above the officer's right to a hearing has been
postponed till after the suspension. This is one of the
conditions upon which he accepts the office, and it is
as obligatory upon him as are those as to age, resi-
dence or bond, or any other which the Constitution or
any valid statute may prescribe. That a Governor
may give notice of the charges before suspension,
does not defeat the plain policy of the Constitution
not to require him to do so, nor does it relieve him
from the specific duties imposed by that instrument in
this matter. It can not be denied that there may be
cases in which the public interest would suffer grievous
detriment by postponing the suspension till after the
hearing. The hearing contemplated. though its reg-
ulation is left to the Chief Executive, (at least until
the law making power shall act), is a full and fair
hearing, and often will take much time. It is always
to be presumed that he will not hesitate to reinstate at
any time, at least in the recess of the Senate, where it
may be shown that he has erred in the act of suspen-
sion. This is, of course. a consideration which the
people have confided to the conscience of the Execu-
tive under his responsibility to them, yet it is patent
that the exercise of the executive power to reinstate
implies the status of suspension in the officer.

In reaching this conclusion we have not omitted to give serious consideration to the officer's property rights in his office ; the right to its tenure and the enjoyment of its profits and honors *against all unlawful invasion. Of course he is a public agent or servant, and has no such title to his office as prevents the power which gave it from terminating it or changing it. He holds subject to the law of the land as to its termination, modification, and as to suspension or removal therefrom; State *ex rel.* vs. Ledwith, State *ex rel.* vs. Hawkins, Sweeney vs. Stevens, and Donahue vs. County of Will, *supra ;* Taft vs. Adams, 3 Gray, 127. So long as the Governor acts within the limits of his power the courts are powerless. The Constitution has made the Senate the sole check upon any erroneous action on his part. Any mere error of judgment, whether free from or attended by improper motive is beyond our cognizance, and not merely because, as in most of the adjudicated cases, there has been given no power to any tribunal to correct or arrest the effect of his error, but for the reason that a branch of the legislative department has been given that express power.

Under Section 154, sub. 6, R. S., electors had the right to pay poll taxes on Saturday, the third day of September, 1892, to qualify them to vote at the election of October 4th of the same year ; and whether or not the collector was guilty of neglect of duty in not receiving the taxes as alleged in the alternative writ, was a question for the Governor's decision. Section

342 R. S. can not be made to control it, as a matter of law, because the thirtieth day before the election fell on Sunday. The latter section required the collector to furnish the supervisor of registration, thirty days before the election, a list of all persons who had paid their capitation taxes for two years next preceding the year of the election.

III. It is also argued that the power of suspension can not apply where, as in the case at bar, the term of the officer suspended will expire before the next session of the Senate, and in support of the point it is urged that the officer can not in such cases be "restored to the right to resume the duties of the office," unless the Governor should convene the Legislature in special session ; and, further, that it enables him to practically defeat the elective system. If this position is correct, then the power of suspension does not apply to those officers whose term is only two years; except for the period, never more than about three months, which may antecede a session of the Legislature; nor will it apply to a four year officer after the second session of the Legislature during any gubernatorial term. This would result from the prescribed commencement of the terms of officers and from the fixed time of the meeting of the biennial sessions of the Legislature. Is it to be supposed for a moment that the intelligence of the constitutional convention was oblivious to the fact that, under the general effect of the organic law they

proposed to the people, many suspensions might necessarily occur of officers whose terms would expire before the next ensuing session of the Legislature, or that the people did not so understand when they ratified it? Both the members of the convention and the electors are presumed, and conclusively, to have understood it, and yet we find that the power of suspension has been given without any limitation to periods avoiding the result referred to. The purpose of the grant of power was good government; it was entrusted to the Governor because the people believed the public welfare demanded it. They knew that there could be no resumption of duties where the officer's term would expire, and that in such cases the refusal or omission of the Senate to remove would merely prese ve the officer's right to the compensation he would have earned had he not been suspended. Whatever defeat of the elective system it involves, was intended; it, however, in its theory, involves none, as the delinquencies falling within the enumerated causes of suspension must be held to be unanticipated by the people in any particular instance, and wherever they occur and the suspension or removal takes place, the expressed will of the people has been enforced by the suspension and removal. If it be that a Governor may err in executing the powers, it must be admitted the convention and the people were well aware that this might be, yet they entrusted him with the power, and they made it applicable as well when the officer's term would expire before the next Legislature as when it would not.

We may remark here that we are aware that a similar argument is used by Judge Campbell in his opinion referred to above; but it must be remembered that he was contending against the power of the Governor to remove on his own action, and this argument, like his position, finds no support; but, on the contrary, con-demnation in the conclusion of the majority of the Michigan court.

IV. Another position is, in effect, that the Governor has, as shown by the terms of Gillen's commission, extended Gillen's appointment into the term of John-son's successor, and in doing this he has also at-tempted to fill a term which does not become vacant until after the expiration of his own official life. Gillen's commission bears date November 26th, 1892, and appoints him tax collector in and for Duval county until the adjournment of the next session of the Senate. The terms of Gillen's commission can not extend his tenure beyond the actual period, what-ever it may be, which the law attaches to the appoint-ment; nor can any act of one Governor impair the ex-clusive authority of his successor as to any official function. Any expression further than that the ap-pointment of Gillen is, on the pleadings before us, valid for all the purposes of this case as it now stands, would be a mere *obiter*, and will not be indulged in. The case of Hench vs. State *ex rel.*, 72 Ind., 297, does not even tend to sustain the theory that Gillen's commission is void if it be he can not legally hold for

the time it specifies, but rather shows that it is valid for so long as the law will entitle him to hold; and such, in our judgment is the legal effect of the commission. Advisory Opinion as to Attorney-General, 14 Fla., 277.

V. The only points remaining to be considered are those as to the propriety of the remedy invoked, and the absence of Gillen as a party. We will dispose of them in the order stated.

I. In Thompson vs. Holt, 52 Ala., 491, Thompson, the appellant, had been duly elected Judge of Probate for six years, and having duly qualified by taking the oath and giving bond, and having received a commission from the Governor, he entered upon the duties of the office. The law required that Judges of Probate should give an additional bond whenever the grand jury, in term time, or in vacation, three members of the commissioners' court should, by address to the Circuit Judge, require it, and it made the failure to execute such additional bond a forfeiture or vacation of the office. It also imposed on the Circuit Judge the duty of certifying the vacancy to the Governor, who was required to fill it. Thompson having during his term of office been required in the manner stated to give an additional bond, and the Circuit Judge having upon investigation refused to approve a bond, in due form, tendered by Thompson, the judge certified the fact of the vacancy to the Governor, who appointed Holt to fill the vacancy. Holt having qualified and been commissioned by the Governor to the

vacancy, demanded the books and other property of the office, but Thompson refused to deliver, whereupon Holt instituted a statutory remedy given to compel delivery in such cases. The opinion of the Supreme Court of that state, delivered by Brickell, C. J., holds that the giving of the additional bond was a condition upon which the continuance in the office depended, and that the statutory proceeding to compel the transfer of books and other property of a public office, though more summary and less formal, was merely cumulative, and would lie wherever mandamus could be obtained at common law. "*A mandamus*," says this learned judge, "to compel the delivery of property, could not be invoked when in reality the object was to test the title to the office. If the title was the real question in issue, the courts could not interfere by *mandamus*, but remitted the parties to *quo warranto* or other appropriate legal remedy. The relator must have exhibited a clear *prima facie* title, entitling him to the custody of the property of the office, or the courts would not compel its transfer to him. The same rule must prevail with reference to the statutory proceeding. It can not be perverted into a method of determining the strength of rival claims to a public office. The complainant resorting to it must show a *prima facie* title to the office free from all reasonable doubt—a title to which the law attaches the possession of the property of the office. and the right to exercise the functions of the office until in a direct judicial proceeding that title has been vacated. A *prima facie* title to a public office

confers a right to exercise its functions, and a right to the possession of the insignia and property thereof. On this *prima facie* title the court will compel a delivery of the insignia and property, that the functions and duties of the office may be exercised." It was also held that the action of the Circuit Judge in refusing to approve the additional bond could not be inquired into collaterally or on the special proceeding to deliver the official property, and the order made on the special proceeding for the delivery of the property was affirmed. "Public officers," says the opinion, "are elective, and the returns of elections are made to the Secretary of State, on whose certificate the commission originally issues. When subsequently to an election a vacancy occurs otherwise than by resignation, some public officer, ministerial or judicial, acting under the sanction of official oath, is charged with the duty of ascertaining and certifying the fact of vacancy to the Governor. On this certificate an appointment is made, when it discloses that the office is vacant. The commission of the Governor, whether granted on the certificate of election, or a certificate of vacancy, is the highest and best evidence of who is the officer, until on a *quo warranto*, or a proceeding in the nature of *quo warranto*, it is annulled by a judicial determination. It is this commission which imparts to the courts judicial notice and which informs the community who are clothed with official authority and bound to official duty. In a proceeding, whether by *mandamus* or under the statute, to compel the transfer of property attached to a public office, this commission is

a clear *prima facie* title to the office, on which the courts will proceed without indulging any inquiries behind it, when it is founded on a certificate of election or a certificate disclosing vacancy made by proper authority. Inquiries behind it would generate a controversy as to title to the office, which, as we have already said, can not be entertained either on an application for a *mandamus* or in the statutory proceeding. The court must rest on the *prima facie* title, and award the keeping of the property of the office to this title, for the time being, without adjudicating whether the relator has or has not the actual title." In State *ex rel.* vs. Saxon, 25 Fla., 792, 796, 6 South. Rep., 858, we said that if the relator gave the bond and qualified and received the commission he had his remedy by *mandamus* against Saxon to compel him to surrender the custody of the books, files, office room and other property of the office without prejudice to the question of the ultimate right to the office. In State *ex rel.* vs. Atherton 15 Minn., 221, the decision was that upon *mandamus* at the relation of the holder of a certificate of election to the office of clerk of the district court, who has given the bond and taken the oath prescribed by law, the relator is entitled to the seal and other property of the office against one holding by virtue of an appointment till his successor is elected and qualified, and the court will not go behind the certificate of election and try the question whether or not the relator was eligible to such office. These conclusions are affirmed in Crowell vs. Lambert, 10 Minn., 369; State *ex rel.* vs. Jaynes,

19 Nebraska, 161; People vs. Kilduff, 15 Ill., 492; People vs. Head, 25 Ill., 325; High's Ex. Legal Remedies, section 73,• et seq. See also State ex rel. vs. Frechelders, 35 N. J. (Law), 269.

The case at bar is controlled by these authorities, which are clearly distinguishable from cases cited for respondent. People vs. Stevens, 5 Hill, 616, where on an attempted election of a clerk by a board of aldermen there was a tie vote, the relator receiving nine votes, and the defendant, the then incumbent, the same number, and it was declared that no choice was made; and the relator, who was seeking by *mandamus* the books and other official property from the defendant, claimed that one of the aldermen, Osborn, who had voted for the defendant, was not a lawful member of the board, and that consequently he, the relator, had been elected; whereas the defendant claimed there was no election, and the consequent right to hold over until another clerk should be elected and qualify. The majority opinion states, in effect, that the facts showed that the relator proposed to try the title to the office, and "in so doing he must necessarily try the title of Osborn to the office of alderman," and that this could not be done collaterally; and that Osborn being at least a *de facto* officer, his vote was not a nullity, but his acts were valid as to the public. The Matter of Gardner, 68 N. Y., 467; Gardner had in 1873 been elected an alderman and had entered upon the duties of his office January 1st, 1874, and as alderman was *ex-officio* supervisor, and in

November, 1875, under a law of that year, one Carr was elected alderman, and one Coates, supervisor, and were in possession of the offices. Gardner claiming that the act of 1875 was unconstitutional, and complaining that the clerk of the board refused to call his name, or recognize him as a member, asked a *mandamus* to compel him to do so. People *ex rel.* Dolan vs. Lane, 55 N. Y., 217, holds that where one has been installed into an office and is in possession discharging his duties under color of law, and where his right to the office depends upon the construction of a statute so ambiguous as to be difficult of interpretation, the title to the office should not be determined in a proceeding by *mandamus* instituted by another, who had been removed therefrom and claimed the office, to compel payment to him of the salary, the incumbent of the office not being a party to such proceeding. People *ex rel.* vs. Goetting, 133 N. Y., 567, was also a *mandamus* by one removed from the office of clerk, against the respondent who had removed him, to compel respondent to recognize him as clerk, and the new appointee was occupying and performing the duties of the office. In these cases there was either no clear *prima facie* title in the relator or the incumbent was not, and properly could not have been, a party.

In the case at bar there is a clear *prima facie* title free from all reasonable doubt, in Gillen, and there has been not even an irregularity in the exercise of the exclusive executive power of suspension and appointment, and the power to suspend is unquestionable.

The State of Florida ex rel. v. J. E. Johnson.—Opinion of Court.

When the power has been executed in due form it is the duty of the suspended officer to cease to exercise the duties of his office, and it is likewise his duty to turn over the books to the appointee commissioned by the Governor to perform the duties of the office. If it is not done voluntarily, and there is no remedy to compel it, then nothing but confusion in government will follow. It is a mistake to suppose that *mandamus* is excluded or avoided by the mere fact that there is another remedy. The law is that there must be another specific and adequate remedy. Ray vs. Wilson, 29 Fla., 342, 10 South. Rep., 613 ; s. c. Lawyers Reports Annotated, Book 14, p. 773 ; Tapping on *Mandamus*, 18, 19 ; High Ex. Legal Rem. secs. 9, 15, 16, 17; Baker vs. Johnson, 41 Me., 15; People vs. Stevens, *supra ;* Harwood vs. Marshall, 9 Md., 83. Mandamus is clearly the only adequate remedy for preventing the confusion alluded to, and particularly as the Senate, and not the courts, is the body to pass upon the correctness of the action of the executive, so long as he keeps within the range of the power confided to him.

2. Gillen is not a necessary party to this proceeding. The State is the real plaintiff here, just as it would be if he, instead of the Attorney-General, were the relator. The purpose of the action is to enforce the performance of a public duty, the interest in which is common to the whole community. State *ex rel.* vs.

Board of County Commissioners, 17 Fla., 707; Hamil-ton vs. State, 3 Ind., 452 ; County of Pike vs. People, 11 Ill., 202 ; City of Ottawa vs. People, 48 Ill., 233 ; People vs. Collins, 19 Wend., 56 ; People vs. Halsey, 37 N. Y., 344 ; State vs. County Judge, 7 Iowa, 186, 202 ; State *ex rel.* v. Crawford, 28 Fla., 441, 10 South. Rep., 118. In Walter vs. Belding, 24 Vt., 658, where the books of record of a town were wrongfully held by a person claiming to be the town clerk, it was held that the writ of *mandamus* was the proper remedy, and that the same might with propriety be supplicated by the legal town clerk, but if done by the town agent in behalf of the town, it was no such irregularity as to defeat the proceedings. The Attorney-General is a proper representative of the people for instituting these proceedings. It is not an action of replevin for personal property of Gillen, nor an ejectment for his real estate.

The motion to quash, or demurrer, is overruled, and it will be ordered accordingly.